## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Francisco A. Vicente Task Force Officer ("TFO"), Drug Enforcement Administration ("DEA"), United States Department of Justice, being duly sworn, state under oath as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. The following affidavit is furnished to support the issuance of a criminal complaint charging:

**EDUARDO CONTRERAS ("CONTRERAS")**
DOB:

Lawrence, Massachusetts

with conspiracy to distribute fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1) and (C).

2. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request an arrest warrant. I am currently employed by the New Hampshire State Police ("NHSP") and have been since December 17, 2004. I am assigned as a Detective in the Narcotics Investigations Unit ("NIU") tasked to the Portsmouth Tactical Diversion Squad with the DEA as a TFO, where I am primarily engaged in the investigation of, and preparation for prosecution, of narcotic offenses committed in the District of New Hampshire. My duties and responsibilities as a DEA TFO include the investigation of federal crimes, including violations of 21 U.S.C. §§ 846 and 841(a)(1).

3. During my employment with NHSP and DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including heroin, fentanyl, oxycodone, cocaine, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code. I have received significant training in the field of narcotics

enforcement and investigations. I have sworn out numerous affidavits in support of federal search warrants, arrest warrants, Title III intercepts, and other applications. I have also participated in a number of electronic intercept investigations. In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, debriefings of subjects, witnesses, and confidential informants, and reviews of consensually recorded conversations, meetings, and Title III intercepts. Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement.

4. I am familiar with the facts and circumstances of this investigation in part from my own participation in addition to information obtained from other members of state and local police departments to include the U.S. Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), New Hampshire State Police ("NHSP") and the Manchester, New Hampshire Police Department ("MPD"). The purpose of this affidavit is limited to showing that the warrantless arrest of CONTRERAS on May 1, 2018, was supported by probable cause and that probable cause exists to support the issuance of a criminal complaint charging CONTRERAS with violations of Title 21, United States Code, Sections 846, 841(a)(1) and (C). Accordingly, while this affidavit contains all the material information I am aware of with respect to the warrantless arrest and the requested criminal complaint, it does not include each and every fact known by me or other investigators concerning this investigation.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe, and I do believe, that violations of Title 21, United States Code, Sections 846, 841(a)(1) and (C) have been committed, are being committed, and will be committed by Eduardo CONTRERAS, Jr. ("CONTRERAS"), a/k/a "C", a/k/a "CJ" and other conspirators, both known and unknown.

## PROBABLE CAUSE

### Confidential Source #1

6.      On July 2, 2017, at approximately 6:30 p.m., Tilton, New Hampshire Police stopped in individual ("CS #1") while driving his/her vehicle for an equipment violation. As a result of the stop, CS #1 was arrested for possession of marijuana. The vehicle was also seized pursuant to officers observing a plastic baggie containing what appeared to be 'fingers' of heroin/fentanyl on the driver's floorboard.[1] A State of New Hampshire search warrant was obtained that evening authorizing the search of the vehicle which resulted in the seizure of numerous items including approximately 29 fingers (290 grams) of fentanyl and three cell phones. CS #1 was released from custody after posting bail.

7.      CS #1 has prior multiple motor vehicle convictions in Massachusetts. CS #1 is currently cooperating with law enforcement in the hopes of reducing pending criminal charges. CS #1 is a known drug user. I believe that the information CS #1 has provided has been truthful and reliable, as it has been corroborated by surveillance, information obtained from public records, and other sources.

---

[1] I know based on my training and experience that a 'finger' of heroin/fentanyl is a common "street" term to refer to the manner in which drug traffickers typically package approximately ten grams of the controlled substance.

3

8. On July 6, 2017, members of NHSP and HSI interviewed CS #1. During the interview, CS #1 admitted to being a drug runner who delivered illegal drugs, money or both for a white male known to CS #1 as "Tony", who was subsequently identified by law enforcement as Kory L. ALMAND ("ALMAND.")

9. CS #1 stated that it had been working for ALMAND for the past year during which ALMAND would typically call CS #1 to direct CS #1 to meet him at a location in Manchester, New Hampshire. Upon arrival, ALMAND would give CS #1 a bag that was typically marked with a number such as "20" or "30." CS #1 stated that the number on the bag represented how many 'fingers' were in the bag. ALMAND would instruct CS #1 where and to whom to deliver the bag and tell CS #1 how much cash he/she would receive for the product upon delivery. CS #1 stated that after delivering the product he/she would bring the cash back to ALMAND. ALMAND paid CS #1 $300 to $600 dollars cash as payment for making the delivery.

10. CS #1 stated that prior to being arrested, CS #1 picked up the 'fingers' located in CS #1's vehicle from ALMAND and was traveling to deliver them to one of ALMAND's drug customers known to CS #1 as "Mark" in Franklin, New Hampshire, who was subsequently identified by law enforcement as Mark CAMIRE ("CAMIRE".)

11. CS #1 further advised that ALMAND utilized three or four other runners who delivered 'fingers' of fentanyl for ALMAND. CS #1 knew through ALMAND that ALMAND's source for the fentanyl was a male from Lawrence, Massachusetts known as "CJ", "C" or "Cousin".

12.     On July 14, 2017, law enforcement met with CS #1. During the meeting, CS #1 provided additional information regarding ALMAND's source of supply whom CS #1 previously identified as "CJ", "C" or "Cousin". According to CS #1, "C" is a Hispanic male in his early to mid-thirties in age, approximately 5'9" tall and muscular build. CS #1 advised that he/she has met with "C" in person five or six times to either pick up fentanyl or drop of U.S. currency on behalf of ALMAND. CS #1 stated that he/she had delivered currency amounts ranging from $10,000 to $20,000 to "C" for ALMAND. On each of these occasions, "C" was either driving a big white SUV or being driven by another unknown Hispanic male in the same vehicle.

13.     On July 18, 2017, while acting at the direction of law enforcement, CS #1 arranged for a NHSP undercover detective ("UC") to contact ALMAND directly to purchase 10 'fingers' of fentanyl from ALMAND. On July 19, 2017, the UC met ALMAND in Manchester, New Hampshire and purchased 100.96 grams of fentanyl from him for $3,000. On July 25, 2017, the UC made a second purchase of 198.08 grams of fentanyl from ALMAND for $5,500 in Manchester, after which ALMAND was arrested on an outstanding probation violation. Subsequent to ALMAND's arrest, law enforcement executed a search warrant on ALMAND's vehicle and seized an additional 267.67 grams of fentanyl.

14.     I know that the narcotics purchased and/or seized from ALMAND were packaged in the typical manner in which 'fingers' are packaged in the Northeast; however, the ends of the 'fingers' purchased from ALMAND protruded outward in a cone shape, which I found to be unusual.

15.     On September 20, 2017, law enforcement met with CS #1. CS #1 was shown an eight-person photographic array from which CS #1 positively identified CONTRERAS as the individual it knew as "C", "CJ" or "Cousin."

16.     CS #1 further stated that the amounts of cash CS #1 delivered to CONTRERAS for ALMAND varied from $10,000 to $20,000 and that CS #1 met CONTRERAS at different location in South Lawrence, Massachusetts and at a location in Salem, New Hampshire that law enforcement subsequently determined to be an apartment building located at 11 Lancelot Court, Salem, New Hampshire ("11 Lancelot Court.") CI #1 stated that he/she was introduced to CONTRERAS by ALMAND in the summer or fall of 2016.

**Confidential Source #2**

17.     On August 10, 2017, members of the DEA HIDTA and MPD's Special Investigations Unit ("SIU") met with an individual who was subsequently documented as a MPD confidential informant ("CS #2.") During this meeting, CS #2 provided information regarding his/her knowledge of an individual involved in the distribution of heroin/fentanyl known to CS #2 as "C."

18.     CS #2 has prior criminal convictions that include shoplifting (1985), possession of a controlled drug (1986, 1988 (X2), 1992, 1993), receiving stolen property (1991), attempted burglary (1993), and controlled drug acts prohibited (2016). CS #2 is currently cooperating with law enforcement in the hopes of reducing pending criminal charges against one of CS #2's close friends. CS #2 is a known drug user. I believe that the information CS #2 has provided has been truthful and reliable, as it has been corroborated by surveillance, information obtained from public records, and other sources.

19. According to CS #2, for the preceding four to six months leading up to August 2017, CS #2 was a member ALMAND's heroin/fentanyl drug trafficking organization ("DTO") that operated out of the Manchester, New Hampshire, area. CS #2 identified a Hispanic male known to CS #2 as "C" as ALMAND's fentanyl source. CS #2 further believed that "C" possibly resided in the Salem, New Hampshire, area and operated a DTO out of Lawrence, Massachusetts. CS #2 stated that on two separate occasions, CS #2 delivered narcotics proceeds at the behest of ALMAND directly to "C" in a parking lot of an apartment complex located behind a 7-11 store on Rt. 28 in Salem, New Hampshire. I believe that this description is consistent with 11 Lancelot Court. According to CS #2, he/she estimates that both drug payments were between $12,000 and $14,000 each.

20. On September 21, 2017, CS #2 was shown a photographic array. CS #2 positively identified "C" as CONTRERAS with what CS #2 stated was "65% certainty."

21. CS #2 stated that since ALMAND's arrest, he/she could go directly to CONTRERAS to obtain narcotics.

22. On August 10, 2017, at approximately 1:30 p.m., while acting under the direction of law enforcement, CS #2 contacted CONTRERAS at ▓▓▓▓▓▓ to arrange for the purchase of ten 'fingers' of fentanyl for $2,250 later the same evening.[2]

23. At approximately 7:55 p.m., CS #2 informed law enforcement that he/she had been contacted by CONTRERAS to confirm that the deal would occur between 9:30 p.m. and 10:00 p.m. the same evening. The telephone call was not recorded.[3]

---

[2] According to CS #2, CS #2 and CONTRERAS previously arranged this transaction prior to CS #2's cooperation in this investigation. I further believe based on my training and experience that the prices set by CONTRERAS for the drug sales described herein are consistent with the prevailing "street prices" for the quantities of heroin/fentanyl purchased.

[3] Unless otherwise noted, all other telephone calls referenced herein were recorded by law enforcement.

24. At 9:45 p.m., CONTRERAS contacted CS #2 to ask CS #2 "what was taking so long?" and instructed CS #2 to head south in the direction of Lawrence, Massachusetts. Law enforcement directed CS #2 to inform CONTRERAS that CS #2 would "head [his] way."[4]

25. While in route, CS #1 remained under law enforcement surveillance and was in continuous telephonic communication with CONTRERAS. Per the direction of CONTRERAS, CS #2 arrived in the parking lot of Sullivan Avenue, Lawrence, Massachusetts. I know based on my training and experience, that this area of Lawrence, Massachusetts is a known drug trafficking area.

26. Once there, CS #2 parked and remained in constant telephonic contact with CONTRERAS. Shortly after, an unknown Hispanic male approached CS #2's vehicle and entered the passenger side. According to CS #2, CS #2 placed the currency on the center console of the vehicle. The Hispanic male instructed CS #2 to drive down Sullivan Avenue. As CS #2 drove, the Hispanic male reached into his pants and provided CS #2 with ten 'fingers' of suspected fentanyl.

27. During the transaction, CS #2 remained in telephonic contact with CONTRERAS by placing his/her phone somewhere in the vehicle. During the beginning of the transaction, law enforcement monitoring CS #2's body wire heard CS #2 state, "he just got in my car."

---

[4] Before each controlled purchase of narcotics referenced herein, CS #2 and CS #3 met with law enforcement at a predetermined location where law enforcement searched CS #2 and CS #3 for drugs, weapons, currency, and other contraband with negative results. Law enforcement equipped CS #2 and CS #3 with recording and body wire devices and provided CS #2 and CS #3 with serialized U.S. currency to exchange during the controlled purchase of narcotics. Subsequent to each controlled purchase, CS #2 and CS #3 were surveilled to a predetermined location where CS #2 and CS #3 relinquished the suspected controlled substances and recording and body wire devices to law enforcement. Law enforcement again searched CS #2 and CS #3 for additional drugs, weapons, currency, and other contraband with negative results.

28. According to CS #2 and as observed by surveillance units, the Hispanic male exited CS #2's vehicle and left the area on foot. Shortly after, CONTRERAS called CS #2 to ask where the Hispanic male was as he had not responded to CONTRERAS after the deal. CS #2 informed CONTRERAS that he/she didn't know "as the Hispanic male was [CONTRERAS'] guy."

29. CS #2 departed the area and was surveilled to a predetermined location where CS #2 provided law enforcement with the recording device, body transmitter and suspected fentanyl, which the DEA laboratory confirmed consisted of 99.79 grams of fentanyl.

30. Law enforcement noted that the individually wrapped 'fingers' were pressed in such a manner that the ends of the packages were shaped in an outward protruding cone shape consistent with the packing of fentanyl purchased and seized from ALMAND as described above.

31. On August 16, 2017, DEA made contact with CS #2 who stated that earlier in the day, CS #2 spoke with CONTRERAS during which CONTRERAS inquired from CS #2 when CS #2 would be returning to Lawrence to purchase additional quantities of heroin/fentanyl. According to CS #2, during the unrecorded conversation, CS #2 told CONTRERAS that CS #2 would contact CONTRERAS when CS #2 had the funds to make another purchase.

32. On August 24, 2017, DEA met with CS #2 to have CS #2 place a telephone call to CONTRERAS to arrange for the purchase of ten "fingers" of fentanyl.

33. At approximately 12:54 p.m., acting at the direction of law enforcement, CS #2 called CONTRERAS. During this call, CS #2 informed CONTRERAS that CS #2 intended to travel to the Lawrence area later in the evening to pick up "10," meaning CS #2 intended to purchase ten 'fingers' of heroin/fentanyl from CONTRERAS.

34. DEA terminated contact with CS #2 and instructed CS #2 to meet DEA later in the day. At approximately 7:40 p.m., law enforcement reestablished contact with CS #2 at a predetermined location. At approximately 7:07 p.m., CS #2 contacted CONTRERAS to inform him that CS #2 had procured a vehicle and funds necessary to travel to Lawrence to purchase the drugs and further informed CONTRERAS that CS #2 would call later in the evening when CS #2 was ready to depart for Lawrence. DEA terminated contact with CS #2 at this time.

35. At approximately 9:00 p.m., law enforcement met CS #2 at a predetermined location. At approximately 9:47 p.m., CS #2 received an incoming call from CONTRERAS during which CONTRERAS instructed CS #2 to travel to the area of Sullivan Avenue, Lawrence.

36. At approximately 9:50 p.m., CS #2 departed for Lawrence in his/her vehicle under law enforcement surveillance. While in route to Lawrence, CONTRERAS contacted CS #2 to change the location of the meet to Exit 46 on I-93 S, where CONTRERAS instructed CS #2 to make a left hand turn into Methuen and then directed CS #2 to make a left hand turn onto Madison Street, Methuen. At the intersection of Wilson and Madison Streets, CONTRERAS instructed CS #2 to pull his/her vehicle to the side of the road.

37. During this time, CS #2 was in constant telephonic contact with CONTRERAS and CONTRERAS was directing CS #2 in "real time."  I believe, based on my training an experience, that CONTRERAS was conducting counter surveillance on CS #2's vehicle to determine if CS #2 was accompanied by or being followed by law enforcement. Based on this and the amount of motor vehicles in the area, law enforcement temporarily terminated physical surveillance of CS #2's vehicle.

38. Once at the intersection, CS #2 was heard over the body wire engaging in an in person meeting with an unknown individual within CS #2's vehicle, who quickly departed the vehicle. Surveillance units in the greater area surveilled CS #2's vehicle at approximately 10:17 p.m. leave the area heading north.

39. CS #2 was surveilled to a predetermined location where CS #2 provided law enforcement with the recording devices, body transmitter and suspected heroin/fentanyl, which the DEA laboratory confirmed consisted of 98 grams of fentanyl.

40. CS #2 stated that while driving to meet CONTRERAS, CONTRERAS continued to provide CS #2 with directions to Madison Street. According to CS #2, once parked on Madison Street, the same Hispanic male from the August 10, 2017, deal entered CS #2's vehicle and instructed CS #2 to drive a short distance. Once the vehicle was moving, the Hispanic male placed the suspected fentanyl on the center console after which CS #2 provided the Hispanic male with the currency.

41. Law enforcement retrieved the fentanyl from CS #2 and noted that the individually wrapped packages of fentanyl were pressed in such a manner that the ends of the packages were shaped in an outward protruding cone shape consistent with the packing of fentanyl purchased and seized from ALMAND in July, 2017 and purchased from CONTRERAS' runner on August 10, 2017.

**Confidential Source #3**

42. On September 28, 2017, members of the DEA HIDTA and MPD's NIU met with another MPD confidential source ("CS #3.") During this meeting, CS #3 provided information regarding his/her knowledge of an individual known to CS #3 as "C" who was involved in the

distribution of heroin/fentanyl who CS #3 subsequently positively identified through a photographic array as CONTRERAS.

43.     CS #3 has a 2017 criminal conviction for Possession with Intent to Distribute Controlled Substances for which he received a 3 ½ to 7 year sentence, suspended. CS #3 is currently cooperating with law enforcement as part of a pretrial resolution on this criminal conviction. CS #3 is a known drug user. I believe that the information CS #3 has provided has been truthful and reliable as it has been corroborated by surveillance, audio and video recordings, information obtained from public records, and other sources.

44.     Later the same day, law enforcement directed CS #3 to contact CONTRERAS to arrange for the purchase of 20 'fingers' of fentanyl.  During the telephone conversation, CS #3 asked CONTRERAS if he was "heavy", meaning was CONTRERAS currently in possession of narcotics. CONTRERAS asked CS #3 what he/she wanted and CS #3 asked CONTRERAS the price "for 20", slang for 20 'fingers' of fentanyl. CONTRERAS gave CS #3 a price of $180 per 'finger'.  CS #3 asked if the deal could be done quickly; however, CONTRERAS instructed CS #3 to wait one hour for traffic to slow down and for nightfall to arrive.

45.     At approximately 5:59 p.m., CS #3 received an incoming call from CONTRERAS.  During the call, CONTRERAS asked CS #3 if he/she "wanted an extra three or four units" for $4,000, meaning three or four additional 'fingers'.  CONTRERAS explained to CS #3 that the price broke down to about $173 to $171 per "unit", which is code for 'fingers' of fentanyl.  CS #3 replied that CS #3 had the funds for only the arranged 20 'finger' purchase.

46.     At approximately 6:34 p.m., CONTRERAS contacted CS #3 to inquire about CS #3's estimated time of arrival in Lawrence, Massachusetts. CS #3 responded that he/she was 35 to 45 minutes away. CONTRERAS instructed CS #3 to begin to travel to Lawrence. Law

enforcement equipped CS #3's vehicle with video and audio recording equipment which were activated prior to CS #3's departure.

47. During the period CS #3 travelled to Lawrence, CONTRERAS called CS #3 to check on CS #3's time of arrival and provide CS #2 directions of where to meet.

48. Once at this location, surveillance units observed that CONTRERAS entered the passenger side of CS #3's vehicle. According to the video and audio recordings I have viewed and CS #3, once in the vehicle, CONTRERAS instructed CS #3 to turn off the headlights and directed CS #3 to park in a dark area. CONTRERAS told CS #3 that he heard engine noise from a plane.

49. Approximately one minute later, CONTRERAS directed CS #3 to drive. As CS #3 did, CONTRERAS told CS #3 "to take a left" and stated, "Here it is. 20." CONTRERAS then asked CS #3, "36?" CS #3 handed CONTRERAS the currency, which CONTRERAS placed in his pocket. CONTRERAS went on to tell CS #3 that his cousin was caught by police through the use of a helicopter. Also during the meeting, CS #3 told CONTRERAS that he/she thought about accepting the additional four 'fingers' CONTRERAS referenced in the earlier telephone call and asked if CONTRERAS would "front" (provide in advance of payment) the drugs to CS #3. CONTRERAS responded that would not have been a problem and CONTRERAS would have given CS #3 three additional 'fingers' on consignment. CONTRERAS exited the vehicle and left the area. CS #3 drove uninterrupted under law enforcement surveillance to a prearranged location and relinquished the suspected fentanyl. A review of the audio and video recordings corroborates CS #1's rendition of the meeting.[5]

---

[5] Conversations between CS #3 and CONTRERAS captured through recorded telephone calls, video and/or audio recordings are in Spanish. A DEA SA, who is fluent in Spanish, reviewed the recordings to determine their content.

50. The suspected heroin/fentanyl was retrieved from CS #3. The package consisted of one clear cellophane bag that contained 20 individually wrapped cylindrical packages that the DEA laboratory determined to be 200.8 grams of fentanyl. Again, law enforcement noted that these individually wrapped packages were pressed in such a manner that the ends of the packages were shaped in an outward protruding cone shape consistent with the packing of fentanyl as described above.

51. On October 27, 2017, CS #3 received an incoming telephone call from CONTRERAS. CS #3 asked CONTRERAS if he had changed his telephone number recently, which CONTRERAS confirmed. During the conversation, CS #3 asked CONTRERAS if CS #3 could get a better price for a large quantity of 'product', meaning oxycodone pills.[6] CONTRERAS replied that he could not give CS #3 a better price because the pills were difficult to obtain and CONTRERAS receives a large quantity of pills all at once.

52. CS #3 next asked CONTRERAS if [the pills] "are the little ones and not the big ones." CONTRERAS responded that [the pills] were "the 30s" but that they come mixed. I know based on my training and experience that "30" is a reference to 30 mg oxycodone tablets. Later in the conversation, CONTRERAS stated that he could do "one, two or three for 24." I believe, based on my training and experience and my knowledge of the current "street price" for 30 mg oxycodone tablets, that CONTRERAS meant that he could sell CS #3 one, two or three thousand pills for $24/pill. CONTRERAS further stated that he has a "serious" guy who deals with the pills. The two spoke about meeting the following week during which CS #3 again asked for a better price for the pills. The conversation terminated.

---

[6] According to CS #3, CONTRERAS and CS #3 had previously discussed CONTRERAS supplying CS #3 with quantities of oxycodone tablets.

53. On October 30, 2017, CONTRERAS called CS #3 and asked CS #3 about "work" the following day, October 31, 2017. As detailed elsewhere in this affidavit, "work" is a code term for conducting a drug transaction. CS #3 explained to CONTRERAS that the following day was Halloween and that CS #3 had forgotten about the holiday and trick-or-treating with his/her children. CONTERAS and CS #3 discussed getting back in contact later in the week and the conversation terminated.

54. On November 30, 2017, at approximately 6:15 p.m. and while acting at the direction of law enforcement, CS #3 and CONTRERAS arranged for CONTRERAS to sell CS #3 20 'fingers' of fentanyl for $3,500 in Lawrence, Massachusetts. Law enforcement equipped CS #3's vehicle with video and audio recording equipment which were activated prior to CS #3's departure.

55. While CS #3 travelled from New Hampshire to meet CONTRERAS, CS #3 remained in almost constant telephonic contact with CONTRERAS, who directed CS #3 to travel to the area of 273 Salem Street, Lawrence.

56. Upon CS #3's arrival, CONTRERAS was surveilled as he waked towards CS #3's vehicle and enter it. According to the video and audio recordings of the meeting between CS #3 and CONTRERAS and CS #3, once in CS #3's vehicle, CONTRERAS reached into his right pants pocket, retrieved an object wrapped in plastic and handed it to CS #3 after which CS #3 handed CONTRERAS the $3,500. CONTRERAS instructed CS #3 to give him enough notice in the future so that CONTRERAS has adequate time to be ready and do what he needs to in order to be ready for CS #3.

57. CONTRERAS exited the vehicle and left the area. CS #3 drove uninterrupted under law enforcement surveillance to a prearranged location where the suspected

heroin/fentanyl was retrieved from CS #3. The package consisted of one clear cellophane bag that contained 20 individually wrapped cylindrical packages that the DEA laboratory determined to be 197.5 grams of fentanyl. Again, law enforcement noted that these individually wrapped packages were pressed in such a manner that the ends of the packages were shaped in an outward protruding cone shape consistent with the packing of fentanyl as described above.

### Confidential Source #4

58. On September 18, 2017, members of the DEA TDS and NHSP NIU conducted surveillance on a suspected drug courier in the ALMAND/CONTRERAS DTO. During the course of the surveillance, law enforcement conducted a motor vehicle stop of this individual's vehicle, who will be referred to as CS #4. As a result of the vehicle stop, CS #4 was arrested for operating a motor vehicle with a suspended driver's license during which time he/she was found to be in possession of a small quantity of fentanyl. CS #4's operating privileges had been previously suspended by the Director of Motor Vehicles for the State of New Hampshire for failure to pay a traffic citation. CS #4 was placed under arrest.

59. Subsequent to CS #4's arrest, members of the DEA TDS and NHSP NIU met with CS #4 on September 18th and 19th, 2017. During these recorded meetings, CS #4 provided information regarding his/her knowledge of an individual known to CS #4 as "CJ" who was involved in the distribution of heroin/fentanyl. On September 19, 2017, CS #4 positively identified "CJ" as CONTRERAS through a photographic array.

60. CS #4 has no prior criminal convictions. CS #4 is currently cooperating with law enforcement for consideration on possible criminal charges related to the above-referenced arrest. CS #4 is a known drug user. I believe that the information CS #4 has provided has been

truthful and reliable as it has been corroborated by surveillance, audio and video recordings, information obtained from public records, and other sources.

62. During the September 18, 2017 meeting, CS #4 stated that he/she was aware of the July 25, 2017 arrest of ALMAND and further stated that CS #4 met ALMAND in approximately the early-fall of 2015 in Manchester, New Hampshire through a female identified as "Sam." "Sam" requested that CS #4 provide her with a ride to meet ALMAND, who was "Sam's" heroin source. During this meeting CS #4 and ALMAND exchanged telephone numbers. Approximately one week later, CS #4 contacted ALMAND to purchase one gram of heroin.

63. CS #4 stated that he/she met ALMAND to obtain heroin at least three times a week. Initially, CS #4 purchased 5 grams of heroin at a time from ALMAND but gradually increased the quantities he/she purchased to 'finger' quantities.

64. CS #4 reported that in 2016, ALMAND served a period of incarceration in Maine. During this time, CS #4 met with "Sam" to obtain heroin; however, CS #4 did not trust "Sam." As a result, CS #4 made direct contact with CONTRERAS, who CS #4 knew as "CJ"

65. According to CS #4, he/she met CONTRERAS at an apartment building in Salem, New Hampshire that investigators subsequently determined was 11 Lancelot Court. CS #4 stated that CONTRERAS always arrived at 11 Lancelot Court before CS #4 and conducted counter surveillance. CS #4 stated that CONTRERAS provided CS #4 with a key to the main door of 11 Lancelot Court and would meet CONTRERAS inside the building, sometimes in the basement and sometimes in the main hallway.

66. During their first meeting, CS #4 purchased 20 'fingers' with funds provided by "Sam." CS #4 reported that CS #4 met CONTRERAS several times a week. After a time, CS #4

determined that "Sam" ran a "loose" drug DTO and CS #4 was concerned that he/she would be arrested by law enforcement if CS #4 continued to act as a drug courier for the DTO. As a result, CS #4 thereafter met with CONTRERAS directly to purchase personal use quantities of heroin.

67.	Once ALMAND was released from custody in Maine, ALMAND contacted CS #4 to request that CS #4 meet CONTRERAS to obtain 20 'fingers' of heroin and bring the drugs to ALMAND in Maine. In turn, ALMAND paid CS #4 two 'fingers' of heroin. CS #4 stated that depending on the distance CS #4 had to travel for ALMAND, ALMAND paid CS #4 by giving CS #4 one or two 'fingers' of heroin.

68.	After ALMAND's July 25, 2017 arrest, CONTRERAS contacted CS #4 to advise CS #4 of the arrest and told CS #4 to "drop" his/her phone. CS #4 stated that CONTRERAS contacted CS #4 from a Dominican Republic telephone number that CS #4 could not call or text.

69.	I know from a review of subpoenaed airline records that on July 27, 2017, an individual listed as Eduardo CONTRERAS with a listed address of ███ Lawrence, Massachusetts, accompanied by Rawilda MEJIA-CONTRERAS, flew from Logan International Airport, Boston, Massachusetts to Puerto Plata, Dominican Republic on tickets purchased the previous day. On August 8, 2017, both individuals returned to Boston having purchased return tickets on August 2, 2017.

70.	CS #4 stated that CONTRERAS utilized a drug runner named "Manny."

71.	CS #4 stated that on the morning of ALMAND's arrest, CS #4 picked up 150 'fingers' of heroin/fentanyl from CONTRERAS at 11 Lancelot Court and brought them back to his/her Manchester residence. Prior to his arrest, ALMAND went to CS #4's residence and took a portion of the drugs.

72. CS #4 further stated that prior to meeting with the NHSP UC on July 25, 2017, ALMAND delivered a quantity of the drugs to COMIRE.

73. At the time of ALMAND's arrest, CS #4 still had the remaining quantity of drugs at his residence. CS #4 stated that he/she contacted CONTRERAS around August 2, 2017 to take back the drugs; however, CONTRERAS would not meet with CS #4 and advised CS #4 to dispose of the drugs. CS #4 stated that he/she believed that CS #4 disposed of approximately 75 'fingers' of heroin/fentanyl in the trash which had an estimated street value of $21,000.

74. According to CS #4, at the time of his arrest ALMAND had a roommate named James MONICO ("MONICO"), a/k/a "Santa." After ALMAND's July, 2016 arrest, CONTRERAS contacted CS #4 to inform him/her that MONICO was to be trusted. CS #4 understood this to mean that MONICO was replacing ALMAND in the DTO.

75. CS #4 stated that ALMAND distributed approximately 300 'fingers' a week in New Hampshire and that CS #4 typically picked up 50 to 100 'fingers' at a time for ALMAND, depending on demand.

76. During the subsequent September 18, 2017 interview, CS #4 estimated that he/she picked up approximately 2,500 'fingers' of heroin/fentanyl during the time he dealt with CONTRERAS and in the six months leading to July 25, 2017, met CONTRERAS two to three times per week to pick up drugs for ALMAND and much smaller quantities for CS #4's personal use.

77. CS #4 further reported that he/she met with both "Manny" (CONTRERAS' runner) and CONTRERAS directly at 11 Lancelot Court to pick up drugs. CS #4 stated that he/she also met with "Manny" and CONTRERAS at locations in Lawrence, Massachusetts to obtain drugs.

## CONCLUSION

78.     On the basis of the foregoing information, I believe that there is probable cause for the issuance of a criminal complaint charging CONTRERAS with conspiracy to distribute fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1) and (C).

I declare that the foregoing is true and correct.

/s/ Francisco A. Vicente
TFO FRANCISCO A. VICENTE
U.S. DRUG ENFORCEMENT ADMINISTRATION

Subscribed and sworn to before me this the 1st day of May, 2018.

   /s/ Andrea K. Johnstone
HON. ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW HAMPSHIRE